COZEN O'CONNOR  
*Attorneys for 40 Broadway Associates No. 2 LLC*  
Frederick E. Schmidt, Jr.  
277 Park Avenue  
New York, NY  10172  
(212) 883-4900  
(646) 588-1552  
eschmidt@cozen.com  

Hearing Date:  May 12, 2015  
at 9:45 a.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

WORLD BITCOIN ASSOCIATION LLC,

Debtor.

Chapter 11

Case No.:  15-10618 (REG)

**REPLY IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASE**

40 Broadway Associates No. 2 (the "**Landlord**"), by its attorneys, Cozen O'Connor, as and for its Reply in support of its *Motion to Dismiss Chapter 11 Case* (the "**Motion**")[1] and in opposition to the *Debtor's Objection to Motion to Dismiss Chapter 11 Case* [Docket No.   ] (the "**Response**"), respectfully asserts as follows:

**The Case Was Filed in Bad Faith**

1. The *only* reason that the Debtor filed this Case was to retain its stay on appeal without having to pay to the Landlord the $150,000 in use and occupancy upon which the Stay Order was conditioned.  Nothing in the Response or in the accompanying *Affidavit of Nikolaos Spanos In Support of Debtor's Objection to Motion to Dismiss Chapter 11 Case* (the "**Spanos**

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

**Affidavit**") says otherwise.  Indeed, the Spanos Affidavit affirmatively states that the Case was commenced "in order to preserve [the **Debtor's**] interest in the Lease and the [Premises] so that it to [sic] complete its appeal, vacate the warrant of eviction, assume the Lease, and successfully consummate a plan of reorganization."  (Spanos Affidavit ¶ 20).

2. Not only has the Debtor **so** far had a free ride on pre-petition use and occupancy, but to date it has not made any post-petition payments despite claiming an interest in the Lease and continuing to occupy the Premises for two full post-petition rent periods.

3. If this case were not essentially a two-party dispute (an allegation which the Debtor does not contest), the Debtor's stated intention to somehow resurrect the expired Lease *could*, under the right circumstances, evidence a good faith restructuring intent.  The absence of any significant third party creditors, however, lays bare the Debtor's real motivation – to gain a tactical advantage against the Landlord (the only real third party creditor) in state court litigation.

4. If there were legitimate third party creditors, the Debtor could argue that delaying and hindering one creditor in litigation – i.e. the Landlord – would result in the ability to make distributions to rest of the Debtor's creditors.  That is not the case here.

5. The lack of material third party claims exposes the Debtor's lack of good faith and any intent to reorganize.  The Debtor's logic to the contrary is circular.  It cannot argue that it requires bankruptcy protection in order to preserve its litigation rights against its only real third party creditor (the Landlord); so that it can formulate a plan of reorganization; cram that plan down over the Landlord's objection; all just to give it the ability to make a distribution on account of the Landlord's claim.  That is not a restructuring of debts, it is an attempt to subvert the bankruptcy process in a two-party state court dispute, solely for the benefit of insiders.

6. Nobody, other than insiders, gains anything from the filing of this Case.  It is

uncontested by the Debtor that the only other two non-insider creditors have de minimis claims at best. The rest of the Top 20 List and Schedules were packed with insider creditors in order to give the appearance of a real creditor body.

7. The Debtor, while arguing against the mechanical application of *C-TC* factors, admits that "some of the C-TC factors may be present." Those factors should be ignored, according to the Debtor because it can implement "a plan of reorganization [that] will inure to the benefit of the Debtor's creditors and equity holder." (Response ¶ 13). The Landlord does not contest that insider creditors may be benefitted or that the equity holder may benefit from the Case. But the Debtor has no credible explanation of how non-insider creditors (or, more realistically, the only real non-insider creditor) would be benefitted by continuing this Case.

8. Perhaps mindful of the uphill battle it faces in credibly arguing that it filed this Case for a proper bankruptcy purpose, the Debtor attempts some misdirection, arguing that the Landlord's actions justify a bankruptcy filing. (See Response ¶ 18 "*Notwithstanding 40 Broad's attempts to cast itself as the aggrieved creditor, the Debtor's financial distress caused by the horrid conditions at the Property, establishes a legitimate reason for the Debtor to seek relief under the Bankruptcy Code.*"). Specifically, the Debtor argues that its inability to pay basic operating expenses was somehow caused by the Landlord's installation of scaffolding at the Premises and its failure to remedy leaks. This argument is nonsense.

9. The Premises is a commercial condominium unit in a building containing many condominium units. The Landlord did not erect the scaffolding, the Condominium Board did. Nor does the Landlord have control over the scaffolding.

10. Further, page 2 of the Lease provides that "[Debtor] has examined and knows the condition of the premises, and acknowledges that no representations as to the condition and repair

3

thereof, and no agreements or promises to decorate, alter, repair or improve the Premises, have been made by [Landlord] or his agent prior to or at the execution of this lease that are not herein expressed." Thus, even if the Landlord could control the scaffolding and even if there were leaks coming into the Premises, the Landlord is not required to remedy either alleged condition.

11. Remarkably, the Debtor admits that its ability to successfully reorganize hinges upon the Landlord being forced to cure property defects for which it is not responsible. Paragraph 24 of the Response states: "The Debtor asserts that if the water problem was resolved and the scaffolding removed, it will have a reasonable probability of emerging from this Chapter 11 case and a realistic chance of reorganizing." Thus, if the "water problem" is not resolved and the scaffolding is not removed, then there is no reasonable probability that the Debtor will emerge from the Case and there is no realistic chance of the Debtor reorganizing.

12. Stung by the similarities between this Case and *In re Island Helicopters, Inc.*, 211 B.R. 453 (Bankr. E.D.N.Y. 1997) and *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309 (Bankr. S.D.N.Y. 2001), the Debtor attempts, but fails, to distinguish those cases.

13. The Debtor tries to distance itself from *Island Helicopters* by asserting "[i]n contrast to the case at bar, the issue in In re Island Helicopters, Inc., there was no dispute as to whether the Lease terminated pre-petition, since the parties had entered stipulations concerning that matter." (Response ¶ 30). What the Debtor misses, however, was that the *Island Helicopters* debtor filed its chapter 11 petition in an effort to retain its hold on leased property just like this Debtor. Further, the debtor argued that the pre-petition termination of the lease (in that case by stipulation, here by the lapse of time) was not effective. Thus, rather than distinguishing the *Island Helicopters* case, the Debtor further highlights their similarities.

14. The Debtor also attempts to distinguish the facts of *In re Kaplan Breslaw Ash, LLC*,

4

with similar results. The Debtor claims that this Case is different because the *Kaplan* debtor "had no cash flow, [whereas] the Debtor in the case at bar has the potential for a significant cash flow…" (Response ¶ 32).

15.     The Debtor does not explain why the difference between "no cash flow" and "potential" cash flow is significant. In making the comparison of no cash flow to the *potential* for significant cash flow, the Debtor concedes that it does not *now* have significant cash flow (like the *Kaplan* debtor). Indeed, the Debtor concedes that it currently has no, or at the very least negligible, cash flow, having not contested the Landlord's assertion that the Debtor has "little cash flow" that is "insufficient to meet the Debtor's projected expenses." (Motion ¶ 31).

16.     In the *Kaplan* case, the debtor had a tenant "which is said to pay monthly rent to the Debtor." *In re Kaplan Breslaw Ash, LLC*, 264 B.R. at 315.[2] Thus, it appears what little cash flow the *Kaplan* debtor had was comparable to the de minimis cash flow generated by the Debtor in this Case.

17.     The Debtor also argues that "in contrast to the debtor in In re Kaplan Breslaw Ash, LLC, the Debtor in this case simply wants to have an opportunity to have the issues determined while preserving its rights in the Property." (Response ¶ 32). In other words, the Debtor wants to utilize the automatic stay (to the extent it applies) in order to perpetuate the stay on appeal without having to pay either the use and occupancy upon which the Stay Order was conditioned, or current or future use and occupancy. The Debtor does not explain how its strategy is materially distinguishable from the *Kaplan* debtor's strategy to use the automatic stay to "maintain ownership of the Warehouse without satisfying the debt associated with it, and to effect delay, and, if possible,

---

[2]  The Court noted that although the lease may still have been alive and would result in some income to the *Kaplan* debtor, the debtor stated in its Rule 1007-2 Affidavit that it would have no income or expenses in the 30 days following its bankruptcy filing. *Id.* at 317-18.

5

a total blockage of [the secured lender's] remedies." *Id.*, at 335. The Debtor, therefore, has failed to distinguish *In re Kaplan Breslaw Ash, LLC*, which is on point and warrants a finding of bad faith.

18.  For all of the reasons above and set forth in the Motion, the Landlord respectfully submits that bad faith is present and that the Case, therefore, should be dismissed.

### Section 362(b)(10) Applies

19.  Although not central to the relief sought in the Motion, the Landlord explained to the Court why it sought dismissal of the Case, rather than relying on section 362(b)(10) of title 11 of the United States Code (the "**Bankruptcy Code**") to continue with the Debtor's eviction proceedings post-petition. (See Motion, fn. 1).

20.  Specifically, the Landlord stated that it sought dismissal, rather than relying on Bankruptcy Code section 362(d)(10), because § 108(b) of the Bankruptcy Code arguably applied to increase the term of the stay in the Stay Order until May 17, 2015 – 60 days after the filing.

21.  Section 362(b)(10) of the Bankruptcy Code provides that the automatic stay provisions of 362(a) do not apply to "any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property." 11 U.S.C. § 362(b)(10).

22.  In its Response, the Debtor argues that section 362(b)(10) does not apply here because "as of the Petition Date, the Debtor had a sufficient interest in the Property to invoke the automatic stay provisions of section 362(a) of the Bankruptcy Code." (Response ¶ 34).

23.  As support for its argument, the Debtor cites *Condal Distributors, Inc. v. 2300 Xtra Wholesalers, Inc. (In re 2300 Xtra Wholesalers, Inc.)*, 445 B.R. 113 (S.D.N.Y. 2011); *In re*

6

*Griggsby*, 404 B.R. 83 (Bankr. S.D.N.Y. 2009); *In re Sweet N Sour 7th Ave. Corp.*, 431 B.R. 63 (Bankr. S.D.N.Y. 2010); and *Super Nova 330 LLC v. Gazes*, 693 F.3d 138 (2d Cir. 2012).

24. None of the foregoing cases involves a lease that expired on its natural expiration date. All of those cases involve leases where the landlord unilaterally terminated the leases based on specified lease defaults and where the landlord had not yet fully completed evictions. *In re Xtra Wholesalers, Inc.*, 445 B.R. at 116 (landlord terminated for failure to maintain property, failure to tender timely rent, and unapproved alterations); *In re Griggsby*, 404 B.R. at 85 (lease terminated for failure to remedy "Collyer Conditions" in a residential apartment); *In re Sweet N Sour 7th Ave. Corp.*, 431 B.R. at 66 (lease terminated for default under a stipulation that required the tenant to pay rent according to a schedule); *Super Nova 330 LLC v. Gazes*, 693 F.3d at 140 (lease terminated for failure to pay rent).

25. Here, the Lease simply expired by the passage of time on April 30, 2014, its natural expiration date. The expiration date of the Lease was not accelerated as in the cases cited by the Debtor.

26. The Lease contained an option for the Debtor to "extend its occupancy for a ten year period subject to a lease form agreed to and executed by both Lessor and Lessee." (See pg 3 of Lease attached to Motion as Exhibit B).

27. The Debtor argues that it did not exercise the option because the Landlord insisted upon a personal guaranty as part of the lease form that would have to be agreed to and executed by both Lessor and Lessee. (Spanos Affidavit ¶ 6, *see also*, the Civil Court Order annexed to the Motion as Exhibit E ("Petitioner sent respondent lease-renewal papers, but respondent did not agree to renew because the lease renewal included a personal guarantee that was not mentioned in the original lease.")).

7

28.     Regardless of why, the fact is that the Lease was not renewed or extended. Thus, the Lease expired on its natural expiration date by the passage of time. This is important because it removes the underpinnings of the Debtor's cited cases, all of which rely on the impact of New York's Real Property Actions and Proceedings Law (the "**RPAPL**") § 749(3) in their holdings that the automatic stay applied on those facts and circumstances.

29.     RPAPL § 749(3) provides in relevant part:

> The issuing of a warrant for the removal of a tenant cancels the agreement under which the person removed held the premises, and annuls the relation of landlord and tenant, but nothing contained herein shall deprive the court of the power to vacate such warrant for good cause shown prior to the execution hereof.

RPAPL § 749(3).

30.     In the context of eviction proceedings for non-payment of rent or other cause that does not include a simple expiration of a lease, courts have interpreted the foregoing clause to mean that the issuance of a warrant cancels an existing lease between the parties, subject to the court's power to later vacate that warrant. *See e.g., Super Nova 330 LLC v. Gazes*, 693 F.3d at 142 ("Under New York law, therefore, while the issuance of a warrant of eviction cancels any *existing* lease and seemingly terminates the landlord-tenant relationship, the tenant, in fact, retains a residual interest in the lease until the execution of the warrant. Prior to such execution, the state court may vacate the warrant of eviction for good cause and thereby reinstate the lease.") (emphasis added); *In re Sweet N Sour 7th Ave. Corp.*, 431 B.R. at 67 ("the Debtor's leasehold rights were terminated upon the issuance of the warrant of eviction, subject to the power of the state court to vacate the warrant for good cause prior to execution of the warrant.").

31.     Here, a warrant was not needed to cancel the Lease. It had already expired on its natural expiration date due to the passage of time. Further, vacatur of a holdover warrant could

not reinstate the Lease as it would only put the Debtor back into possession of an expired lease.

32. The only New York case that the Landlord has been able to locate which discusses the application of section 362(b)(10) to a lease which has already expired on its natural expiration date is *In re Neville*, 118 B.R. 14 (Bankr. E.D.N.Y. 1990). There, the debtor tenant and its landlord had been embroiled in a holdover proceeding commenced by the landlord after the expiration of the subject lease. *Id.*, at 15.

33. Following the tenant's commencement of a chapter 11 case, the landlord was successful in having the debtor evicted. The debtor then moved for sanctions against the landlord and the Sheriff of Nassau County for violation of the automatic stay. *Id.*, at 15.

34. The *Neville* Court found that sanctions were not warranted as section 362(b)(10) excepted the landlord's actions from the scope of the automatic stay based upon the pre-petition expiration of the stated term of the subject lease. *Id.* at 18. In so doing, the court noted:

> The legislative history of Section 362(b)(10) indicates that it was intended to permit landlords to proceed promptly in State Court to reclaim possession of the non-residential lease premises where the lease expired by its own term and to finalize landlord/tenant disputes such as the one that is the subject of this case. See S.Rep. No. 98–65, 98th Congr., 1st Sess. 68 (1983). For this Court to accept the Debtor's argument that "his equitable possessory interests were protected by the automatic stay" would result in nullifying Section 362(b)(10), which was purposely placed into the Bankruptcy Code to deal with situations such as this.

*Id.*, at 18.

35. Based upon the plain language of section 362(b)(10) and the holding in *Neville*, section 362(b)(10) is applicable in this case and, were it not for the arguable tolling effect of 108(b) on the Stay Order, the Landlord would be free to take acts to obtain possession of the Premises.

## Conclusion

36. To be clear, the Landlord believes that this Case should be dismissed, first and

9

foremost, as a bad faith filing as discussed above and in the Motion. The Court need not determine whether section 362(b)(10) applies in order to make that determination. However, if the Court is inclined not to dismiss the Case for whatever reason, then the Landlord respectfully requests that the Court find that section 362(b)(10) applies and that the automatic stay provisions of 362(a) of the Bankruptcy Code are inapplicable to the Landlord's actions to regain possession of the Premises.

Dated: New York, New York
       May 7, 2015

                                  COZEN O'CONNOR

                                  By: */s/ Frederick E. Schmidt, Jr.*
                                       Frederick E. Schmidt, Jr.
                                277 Park Avenue
                                New York, New York 10172
                                (212) 883-4900
                                (646) 588-1552 (fax)
                                eschmidt@cozen.com
                                *Attorneys for 40 Broadway Associates No. 2 LLC*